STATE TAX COMMISSION *v.* BALTIMORE AND OHIO RAILROAD COMPANY

[No. 69, October Term, 1940.]

*Decided January 3rd, 1941.*

The cause was argued before BOND, C. J., PARKE, SLOAN, MITCHELL, and DELAPLAINE, JJ.

*William L. Henderson, Deputy Attorney General* and *Norwood B. Orrick, Assistant Attorney General,* with whom was *William C. Walsh, Attorney General,* on the brief, for the State Tax Commission.

*John S. Stanley* and *Kenneth H. Ekin,* with whom were *Raymond S. Williams,* and *Hershey, Donaldson, Williams & Stanley* on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

The State Tax Commission of Maryland has brought this appeal from an order of the Circuit Court of Baltimore City, overruling an assessment by the Commission by which a mileage proportion of the rolling stock of the Baltimore and Ohio Railroad Company was subjected to an assessment for the year 1934 for taxation in Baltimore City and in the counties of the state. The Commission maintains that the assessment was made under the authority of chapter 226, pp. 621-726, of the Acts of 1929, which is a codification and revision of the revenue and tax laws of the State of Maryland. The General Assembly of the State, by chapter 687 of the Acts of 1927, authorized the appointment of a Tax Revision Commission, and its report and recommendations are the basis and occasion for the general legislation embodied in chapter 226, and now, as modified by later enactments, found incorporated in article 81, title "Revenue and Taxes," of the Code of Public General Laws, 1939. By section 6, sub-section (2), all tangible personal property located in this state and not by sections 7 and 8 exempted or otherwise provided shall be subject to assessment to the owner and taxation for ordinary taxes, which are defined by section 4 to be all direct taxes which are imposed upon real or personal property. The assessment to be made and the taxes to be laid on such personal property shall be in either the county or city in which it is respectively permanently located, with the reservation, however, that the rolling stock of railroads worked by steam shall be taxed only as provided by section 8, sub-section (a). The mode so prescribed is that rolling stock of railroads worked by steam shall, for purposes of county and Baltimore City taxation, be apportioned among the counties of this state and the City of Baltimore in proportion to the mileage of such railroads therein; and whenever the railroads owning, hiring, or leasing said rolling stock shall extend beyond the limits of this state, that proportion of the total rolling stock not permanently located in this state which the

mileage of such railroad in this state bears to its total mileage shall be deemed located and taxable in Maryland. Section 8, sub-section (a).

Under section 10, sub-section (b) (3), the rolling stock of railroads worked by steam shall be valued and assessed for the purposes of State, county and city taxation, or for any such political entities, by the State Tax Commission. And such assessment shall be at its full cash value of the date as of which taxes are to be levied for the taxable year in question and upon which assessments become final for such year, subject to authorized correction. Code, art. 81, sec. 1, sub-section (20) ; secs. 11, 26, 27, 28, 36-45.

These provisions of the statute with reference to the assessment and taxation of the rolling stock of domestic railroad corporations are subject to strictly construed exemptions from assessment and from state, county and city taxation in this state, as found in the following sub-sections of section 7 of article 81 of the Code:

"(15) Shares of stock in domestic railroad companies, which are subject to taxation upon their gross receipts within this State; and (from State taxes only) the real and personal property of such railroad companies. * * *

"(21) Any property exempted from taxation by this State by the Constitution of the United States or by any Act of Congress passed pursuant to and in conformity with the Constitution of the United States."

By sub-section (4) of section 1 of article 81, the term "domestic" as applied to a corporation shall mean "organized under the laws of this State." It follows that exclusively those domestic railroad companies which are subject to taxation upon their gross receipts within this state are exempt from state taxes only on their real and personal property. The gross receipts tax is declared to be a state franchise tax and is levied annually in terms specifically inclusive of "all domestic or foreign railroad companies, whose roads are worked by steam, doing business in this State." Code 1939, art. 81, sec. 95, sub-sec. (a) (1), and sections 96-100. For the failure

to pay the gross receipts tax as prescribed, the corporate charter may be forfeited. Supra, secs. 152, 153. All taxes are required to be collected by the public officials who are charged with this duty. Code 1939, art. 81, secs. 154-166.

Acting in purporting pursuance of these provisions and within their terms, the State Tax Commission of Maryland assessed the rolling stock of the appellant, which is a domestic corporation of the State of Maryland under a charter of incorporation granted by chapter 123 of the Acts of the General Assembly of Maryland of 1826. The principal office of the Baltimore and Ohio Railroad Company, which, for brevity, will hereafter be called "Company," has, from its creation, been located continuously in Baltimore City. For the tax year beginning with January 1st, 1934, the total mileage which was owned or leased by the Company both within and without the State of Maryland was 6,384.39 miles. Its railway system within the confines of the State of Maryland extends through parts of Baltimore City, Baltimore, Howard, Carroll, Frederick, Washington, Allegany and Garrett, Harford, Cecil, Anne Arundel, Montgomery and Prince George's Counties, with an aggregate mileage of 352.52. Of this amount 234.25 miles were acquired under the charter obtained by the Act of 1826, and 118.27 miles were acquired under franchises granted by later Acts. The total mileage in Maryland upon which local taxes upon fixed property is paid by the Company is 181.20 miles, and included in this particular mileage are 50.79 miles on which local taxes on fixed property are paid through the Philadelphia branch of the Company. The Company claims that the Philadelphia Branch was built under its original charter. See *Balto. & O. R. Co. v. Waters*, 105 Md. 396, 405-414, 66 A. 685; *State v. Balto. & O. R. Co.*, 48 Md. 49, 78, 79; *State v. Balto. & O. R. Co.*, 127 Md. 434, 448, 96 A. 636.

The net value as of January 1st, 1934, of all of the Company's rolling stock which was not permanently located within the State of Maryland was fixed by the

Commission at $145,579,160. The proportion of the mileage (352.52 miles) of the railway lines within the state to the total mileage (6384.39) of its lines both within and without the state was found by the Commission to be 5.521 per centum. On this relative mileage basis the Commission apportioned to the State 5.521 per centum of the total value ($145,579,160) or $8,037,442. The Commission then computed that the proportion of the lines (181.20 miles) within the state on which local taxation is paid to the whole mileage (352.52) within the state is 51.4 per centum, and then concluded that a similar proportion of value of the rolling stock, which was allocated to the State ($8,037,442), should ascertain the value of the rolling stock within the State subject to assessment. 51.4 per centum of $8,037,442 is, in even dollars, $4,131,245, the amount of the assessment which the State claims is apportionable under the statute, on a mileage basis, among the City of Baltimore and the several counties of the State. There is no controversy on the basic facts with respect to the mileage, and the use and value of the rolling stock upon which the assessment was made. The questions involved were submitted on a stipulation of the facts which embraced the following statement: "13. As a record of the receipts and expenditures of the funds of The Baltimore and Ohio Railroad Company and of the operation of its business over all lines and branches of its entire system, the said Company maintains but one set of records and one system of books of account. All of the rolling stock of the Company is carried as one of its assets in one capital account on said books. None of said rolling stock, whether or not permanently located within the State of Maryland, is assigned for use, entirely or at all, to any particular line or branch but all of said rolling stock is used indiscriminately upon the entire system and in and to such localities as the necessities of freight and passenger traffic require."

The formula applied by the Commission in making the assessment is not expressly provided by the statute.

132

Without pausing to consider at present whether this particular method is contemplated by the statute, but assuming that the assessment so made is in mode authorized and proper, the Company must have recourse to a defense which arises outside of the revenue measure whose provisions have been here mentioned. The defense is based on the original charter of the Company, which granted all the rights and powers necessary to the construction of a railroad from the city of Baltimore "to some suitable point on the Ohio River" and to the making of lateral railroads in any direction whatsoever, in connection with said railroad from the City of Baltimore to the Ohio River. Acts of 1826, ch. 123, sec. 14.

The charter endowed the corporation with the privilege of perpetual succession and provided for a capital stock of three millions of dollars, to be divided in thirty thousand shares of the par value of one hundred dollars each. Of these shares, it was expressly provided that ten thousand shares should be reserved for subscription by the State of Maryland and five thousand shares for subscription by the City of Baltimore for the space of twelve months after the passage of the act of incorporation; and the remaining fifteen thousand shares should be offered for subscription by any other corporation or by individuals. It was thus contemplated that the State and the City of Baltimore could invest public funds in the stock of the new corporate enterprise to the extent of one-half of its authorized capital stock. With so large a measure of permitted ownership by the State and by the City of Baltimore in the capital stock, and with the necessity of enlisting the aid of private capital in the hazards of the novel undertaking of the building and operation of the first railroad in the United States, the General Assembly of Maryland further enacted by Section 18 of the Act: "* * * and that the said road or roads, with all their works, improvements and profits, and all the machinery of transportation used on said road, are hereby vested in the said company incorporated by this act, and their successors forever; and the shares of the

capital stock of the said company shall be deemed and considered personal estate, and shall be exempt from the imposition of any tax or burden by the states assenting to this law."

In juxtaposition with this exemption, section 19 authorizes the declaration of dividends on the stock of "the net profits arising from the resources of the said company, after deducting the necessary current and probable contingent expenses; and that they shall divide the same amongst the proprietors of the stock of said company, in proper proportions to their respective shares."

The public nature and interest of this corporate project is not only indicated by the statute, but also by the State's subscription to the stock in the sum of $500,000 under the provisions of the Acts of 1827, ch. 104; and the City of Baltimore's subscription in the sum of $500,-000 under Resolution 1827, No. 41. The continued interest and fostering aid and care of both the State and the City of Baltimore in this railway enterprise is shown by later legislation and noted in the decisions of this tribunal. See *Baltimore v. Balto. & O. R. Co.*, 21 Md. 50, 71, 91; *Brady v. State*, 26 Md. 290, 303; *Balto. & O. R. Co. v. State*, 36 Md. 519; *Brady v. Johnson*, 75 Md. 445, 446, 26 A. 49; *McColgan v. Baltimore Belt R. Co.*, 85 Md. 519, 36 A. 1026; Acts of 1830, ch. 158; of 1831, ch. 330; of 1832, ch. 175 (Washington Branch); *State v. Balto. & O. R. Co.*, 127 Md. 434, 448, 96 A. 636; Acts of 1865, ch. 70 (Metropolitan Branch); Acts of 1835, ch. 395; 1827, chs. 104, 209; 1835, ch. 245; 1836, ch. 276; 1845, ch. 313; 1854, ch. 34; 1866, chs. 154, 157; 1868, chs. 119, 471; 1870, ch. 362.

The charter so granted became on acceptance a contract between the State of Maryland and the Company, whose obligations could not, without the assent of the corporation, be impaired by any act of the legislature of Maryland consistently with the Constitution of the United States Art. 1, sec. 10, which declares that no State shall pass any "Law impairing the Obligation of

134

Contracts." And this impairment may arise from the direct terms of the law or from their necessary construction, since there is no difference in principle between a law which directly and in terms impairs the obligation of a contract and one which produces the same effect in its plain construction and practical operation. *Chesapeake & Ohio Canal Co. v. Baltimore & Ohio R. Co.*, 1832, 4 G. & J. 1, 108, 109, 132, 138, 139, 145-149, see 194-198, 271, 272; *Regents v. Williams*, 9 G. & J. 365; *Norris v. Trustees of Abingdon Academy*, 7 G. & J. 7; *St. John's College v. State*, 15 Md. 330, 373-376; *Sheriff v. Lowndes*, 16 Md. 357, 375, 376; *Darthmouth College v. Woodward*, 4 Wheat. 518, 4 L. Ed. 629; *State v. Baltimore & O. R. Co.*, 48 Md. 49, 70, 71; *Pennsylvania R. Co. v. Baltimore & O. R. Co.*, 60 Md. 263, 267.

As quoted above, one of the obligations of this contract between the State and the Company is that "the shares of the capital stock of the said company shall be deemed and considered personal estate, and shall be exempt from the imposition of any tax or burden by the states assenting to this law." The State had the power to grant this exemption beyond the arbitrary power of repeal, as the right to alter the charter was not reserved and as it was not until the Constitution of 1851 that all incorporations formed after the adoption of this Constitution became subject to the power of repeal or modification at the will of the Legislature. *Supra; Appeal Tax Court v. Academy of Visitation*, 50 Md. 437, 446; *American Coal Co. v. Consol. Coal Co.*, 46 Md. 15; *Shaffer v. Mining Co.*, 55 Md. 74, 79; Constitution of Maryland, art. 3, sec. 48; (1864), art. 3, sec. 51; (1851), art. 3, sec. 47; *In re Tax Cases*, 1841, 12 G. & J. 117; *State v. Northern Cent. R. Co.*, 44 Md. 131, 163-167; *State v. Baltimore & O. R. Co.*, 48 Md. 49, 70-76; *Pennsylvania R. Co. v. Baltimore & O. R. Co.*, 60 Md. 263, 267, 268.

The particular exemption of the shares of the capital stock found in the original charter of the Company was adopted by the General Assembly of Maryland in the incorporation of The Baltimore and Susquehanna Railroad

Company by the Act of 1827, chapter 72, section 20. The exemption came before this court for construction in one of the numerous appeals involving, *inter alia,* the power to tax the stock of The Baltimore and Susquehanna Railroad Company under the Act of March Session, 1841, chapter 23. These appeals were quite numerous and were heard together, with eminent counsel representing the parties, and were reported under the name of *In re Tax Cases* in 12 G. & J. 117. No opinion was filed, but the record and the argument of counsel as reported, and the judgment of the court in affirming the ruling of the Appeal Tax Court of Baltimore, and the syllabus, make it clear that the validity of the exemptions was directly involved and sustained. 12 G. & J. pages 142, 121, 122, 157. See *Laws & Ordinances Relating to Baltimore and Ohio Railroad Company* (1850, John Murphy & Co.), note (a), p. 25; *State v. Northern Cent. R. Co.,* 44 Md. 131, 162, dissent of Alvey, J., page 179; *Anne Arundel County v. Annapolis & Elk Ridge R. Co.,* 47 Md. 592, 609-611; *Frederick County v. Farmers' & Mechanics Nat. Bank,* 48 Md. 117, 119-121.

The like provision, section 18 of chapter 123 of the Act of 1826, with respect to the exemption of the Company from taxation, came before this court for consideration in the appeal of the *Mayor and City Council of Baltimore v. Baltimore & Ohio R. Co.* 1848, which is reported in 6 Gill 288. The case began by an action in assumpsit brought to the January Term, on April 17th, 1846, by the municipality against the Company to recover $3077.63 in taxes alleged to be due as of December 1st, 1845, by the Company to the municipality. The case went to trial before a jury, which found for the Company, and from the adverse judgment entered the municipality appealed.

At the trial of the cause, the plaintiff offered in evidence the Acts of the General Assembly of Maryland and the Ordinances of the Mayor and City Council of Baltimore, relating to taxation in the State or City of Baltimore; and also, the Act of the General Assembly of

Maryland of the December session of 1835, chapter 395. In support of the issue on its part, the defendant offered in evidence its charter, Act of 1826, chapter 123, and all the supplements thereto, and all the laws and ordinances of the municipality relating to the defendant. It was admitted that the defendants owned real and personal estate and shares of its own stock in the City of Baltimore that would be liable to tax and the tax on which would amount to $100, except for the exemption claimed by the Company and denied by the municipality. It was further admitted that, if in the opinion of the court, the stock in the hands of an individual holder would be liable to taxation, the judgment of the court should be entered in favor of the plaintiff for $101 and costs. And it was also admitted that the charter of the Company had been assented to, according to its terms, by the States of Pennsylvania and Virginia and by the United States as legislature of the District of Columbia. At that time the Washington Branch from Baltimore to Washington had been in operation since 1835. *State v. Baltimore & O. R. Co.*, 34 Md. 344, 360.

The terms of the Act of 1841, March Session, chapter 23, with those of Revised Ordinances of 1838, chapter 7, section 2, of Baltimore City, provided that an assessment should be made of all real and personal property in Baltimore City, and a record thereof made and kept by the City Collector. The rolling stock of the main line of the Company and of its Washington Branch was separately assessed for the years 1842, 1843, 1844 and 1845 at $253,-680 for the main line, and $54,750 for the Washington Branch. At this time, the rolling stock being personalty was assessable, if taxable at all, in Baltimore as the principal place of business of the Company. Acts of 1841, ch. 23; *Appeal Tax Court v. Pullman Palace Car Co.*, 50 Md. 452.

With all the issues of fact admitted, there were left the issues of law for the court, which were presented by these prayers on the part of the plaintiff:

"1st. That the real estate of the Baltimore and Ohio

Railroad Company, the defendants, situate in the City of Baltimore, is liable for City taxes.

"2d. That the personal property of the Baltimore and Ohio Railroad Company, situate in the City of Baltimore, is liable for City taxes.

"3d. That the capital stock of the Baltimore and Ohio Railroad Company, the defendants, is liable for City taxes.

"4. That the shares of the capital stock of the Baltimore and Ohio Railroad Company in the hands of the share-holders, is liable for City taxes."

The court at *nisi prius* rejected all these prayers and the plaintiff excepted. *Baltimore v. Balto. & O. R. Co.*, 6 Gill, 288. The report of the cause shows that it was agreed that, in the appellate court, the counsel might read, from the printed volume of the Laws or Ordinances of the City of Baltimore, all such laws and parts of laws or ordinances as either may desire, for the purpose of argument or illustration, to have the same effect as if such laws, or parts of laws, or ordinances, had been set forth at length in the bills of exceptions.

Thus the questions were squarely presented to the court on appeal whether the exemption declared in the charter was operative with reference to the taxes of Baltimore City in respect of either real estate, or personal property or the capital stock of the defendant or its shares of stock in the hands of a shareholder. The appeal was argued by B. C. Presstman for the municipality and by John H. B. Latrobe and Reverdy Johnson for the Company. The opinion was written by Thomas Beale Dorsey, later the Chief Judge, and was concurred in by the other judges who sat. The judgment was affirmed.

In distinguishing the case of *Cheston v. Appeal Tax Court,* 3 How. 133, 11 L. Ed. 529, our predecessors, speaking through Judge Dorsey, said: "The Supreme Court have nowhere intimated (on the contrary the reverse is the clear deduction from its opinion), that to a corporation paying no bonus for its charter, the legislature of Maryland cannot grant an exemption from tax-

ation. In the case now under consideration, it is conceived that such an exemption has been granted; the 18th section of its charter, the act of 1826, chap. 123, having declared that the shares of the capital stock of the said Company shall be deemed and considered personal estate, and shall be exempt from the imposition of any tax or burden. And there is nothing in the charter of the Baltimore and Ohio Railroad Company, or the terms and expressions in which it is couched, or in the objects designed to be accomplished by it, that would justify a construction of this exemption from taxation, as less comprehensive and universal than its terms would ordinarily import. It must, therefore, be held as an exclusion, not only of the State's right to tax, but of the right of all manner of corporations created by the State, within whose limits the Company may have either real or personal property." The court then proceeds to answer another contention:

"But it is said, that although by the charter of the Baltimore and Ohio Railroad Company, its shares of stock may be exempt from all taxation, yet that such exemption in no wise protects from taxation the specific articles of property of the Company. If such a specific property be deemed liable to the imposition of taxes, no sufficient reason can be assigned why the franchise should not be subject to the like imposition. It is as much an ingredient in the shares of stock, and component part of their value, as is any portion of the corporate property of the Company; and if under such an express legislative exemption as that now before us, the one be exempt from taxation, so also is the other.

"The design contemplated by the legislature in the insertion of this clause of exemption in the act of Assembly, was to confer a substantial, not a nominal benefit, on the stockholders, and to induce capitalists to risk their money in a novel and hazardous enterprise. To impute to the legislature, in the case before us, an intention to exempt the shares of the stock from taxation, and at the same time to reserve the right to tax everything which consti-

tuted it a stock, and gave to it its value, would be gratui-tously to cast an imputation upon the legislature, inconsistent with every principle of judicial courtesy. * * *

"The effort made to restrict the immunity now under consideration to State taxes only, cannot be sustained. The terms used in its grant are so broad, unambiguous and universal, and the reasons for making them so accordant therewith, that their full and natural import must be given to them. The exemption covers County and City, as well as State taxes. There are no words used by the legislature qualifying or limiting the extent of the immunity conferred; it is therefore unlike the case of *Gordon v. Mayor and City Council of Baltimore* [5 Gill 231], decided by this court at December term, 1847." See *State v. R. R. Co.*, 44 Md. 131, 162; *State v. B. & O. R. Co.*, 48 Md. 49, 70-78; *Anne Arundel County v. A. & E. R. Co.*, 47 Md. 592, 609-611; *State v. Northern Cent. Ry. Co.*, 90 Md. 447, 472, 45 A. 465; *Wilkens Co. v. Baltimore City*, 103 Md. 293, 310, 311, 63 A. 562; *Baltimore & O. R. Co. v. Waters*, 105 Md. 396, 424, 66 A. 685; *State v. B. & O. R. Co.*, 127 Md. 434, 96 A. 636; *Havre De Grace v. Bridge Co.*, 145 Md. 491, 497, 125 A. 704; *Miller v. State of New York*, 15 Wall. 478, 21 L. Ed. 98; *Baltimore & O. R. Co. v. Maughlin*, 153 Md. 367, 376, 138 A. 334.

After the decision in 1848 in the appeal of *Mayor and City Council of Baltimore v. Balto. & O. R. Co.*, 6 Gill 288, until 1878, the tax exemption feature of the Company's charter was not under review in this tribunal until in *State v. Balto. & O. R. Co.*, 1878, 48 Md. 49, the court had occasion again to consider this exemption and its limitations.

The action in the last mentioned appeal began on the 9th of September, 1876, when the State of Maryland filed in the Superior Court of Baltimore City a declaration in debt to recover of the Company the state tax of one-half of one per centum, levied, under the Act of 1872, chapter 234, on the gross receipts of the defendant Company from all sources, except from its Washington

Branch, from the first of April, 1872, to the 31st of December, 1873. The Act of 1872, chapter 234, had adopted the policy of the taxation of railroads upon their gross receipts and imposed a tax upon all the gross receipts of the Company, except those derived from the Company's Washington Branch, whose gross receipts were exempted from taxation so long as the Company paid the capitation tax imposed upon the receipts accruing to the Company from the operation of this branch. The Company had declined to pay this tax on the ground of its exemption clause.

The cause was heard in the Superior Court, without a jury, and the judgment was for the defendant Company. The appeal was decided on February 21st, 1878, after argument for the parties by eminent counsel.

After mature deliberation, the Court held that:

"In *The Mayor and City Council of Baltimore v. Baltimore and Ohio R. Co.*, 6 Gill 292, the power to tax the *real and personal property*, and the *capital stock of the company, and its shares of stock in the hands of shareholders*, was the question and the sole question, before the Court, and after full argument, all the Judges were of opinion that no such power existed, and that the 18th section of the appellee's charter exempted the property and capital stock, and shares of stock, from taxation.

This decision was made in a case in which the Baltimore and Ohio Railroad Company was a party, and upon the very section of its charter now under consideration. From that time to the present, a period of thirty years, it has been the accepted law of this State; and upon the faith of it millions of dollars have been invested in the property of this company. Every consideration therefore of public policy, and of private right, demands that the decision of the Court upon *the question thus submitted to its adjudication*, shall be *deemed final and conclusive.*"    48 Md. page 71.

The court then remarked that in delivering the opinion of the court in that case, Judge Dorsey had said that the exemption of the shares of the stock of the company ex-

empted also its franchises, because the franchises consti-
tuted and formed part of the market value of such shares,
and that the State had objected to this comment as
*dictum,* and had argued that an expression of opinion
should not control the judgment of the court in a later
appeal in which that point is for decision.

Conceding the point, and considering the question as
one of first impression to be answered by the intention of
the General Assembly, as found from a construction of
the language of the statute in connection with the de-
clared object and the circumstances of its enactment, the
court categorically held "that the 18th section exempts
the property and franchises of the company from taxa-
tion. If the franchises are exempt, it would necessarily
follow, that the gross receipts derived from the exercise
of its franchises, are also exempt." 48 Md. page 74.

On this appeal the argument was pressed that in as
much as the railroad company was required to complete
its road to the Ohio River in 1859, and it having com-
pleted one track by that time, the entire road was to be
considered as completed and equipped at that time, with-
in the meaning of its charter, and that the immunity
from taxation thus granted to the Company is limited to
the exercise of its franchises necessary to operate this
one track, and to the property owned by the Company at
that particular time. The opinion of the court points
out that the object of this provision was to enable the
State to institute proceedings for the forfeiture of the
charter, provided the road was not constructed within
the time thus prescribed, and that the provision could be
waived by the State at pleasure, and, until forfeiture,
the franchise remained unimpaired. The court declared
there was nothing in the letter or spirit of the charter to
justify this argument on the part of the State. On the
legislative conception of the company as a carrier created
and endowed for a permanent public utility which should
develop and expand continually in the great public
service of its design and dedication, the court declined to
limit in time the exemption from taxation. 48 Md. pages

75, 76, 81; *Northwestern University v. Hanberg*, 237 Ill. 185, 86 N. E. 734; *Wilmington, etc., R. Co. v. Reid*, 13 Wall. 264, 20 L. Ed. 568.

After its recognition that the contemplated functioning of the utility "required the continual exercise of the franchises thus granted to the company," the court thus expresses its judgment: "We are of opinion, therefore, that the gross receipts of the appellee's entire road from Baltimore to the Ohio River, and the gross receipts derived from the lateral roads built by the appellee, and from all buildings and works necessary and expedient to the operation of its road are exempt from the imposition of any tax or burden. And this too, whether said road or roads, and buildings, and works were constructed with money derived from the subscription to its capital stock, or from sales of its shares of stock, or from money borrowed, and secured by mortgage, or from the undistributed profits of the company, or from all these sources combined."

After thus finding and defining the meaning of the tax exemption clause, the court made particular and more precise what are the buildings and works necessary and expedient to the operation and maintenance of the Company's road within the meaning of the charter. The court rejected the argument that "necessary" means buildings and works indispensable to the road, but held that it is clear that the Legislature meant such buildings and works as were reasonably convenient and appropriate to the maintenance and operation of the road; such as grain elevators, warehouses, wharves, piers and docks for the purpose of receiving and storing grain and freight which is shipped over the company's road, after their arrival for transfer or re-shipment or at place of destination and before delivery to the consignee or owner; structures, depots and stations for the arrival, departure, protection and accommodation of passengers, guests, bailees and licensees in the use of the freight, express and passenger and other railway services of the company as a common carrier. On the other hand, the charter did not

authorize the Company to carry on the general and ordinary business of warehouseman, however closely such business may be connected with that of the Company and, if authorized to carry on such business by later acts, the Company was held by the court bound to pay the tax imposed by the Act of 1872 on the gross receipts derived from the exercise of this special privilege or franchise; and, if not so later authorized, and structures are owned and used by the Company for the purpose of carrying on a business separate and distinct from its business and obligations as a carrier, then such structures are taxable according to valuation as other real property. 48 Md. pages 77, 78.

Again, the court held that the gross receipts derived by the Company from properties held and owned, not in pursuance of any power conferred by its *original charter*, but under subsequent grants from the Legislature and upon which no tax exemption was engrafted, were subject to taxation under the Act of 1872. Thus, the distinct privilege or franchise granted by the Act of 1836, ch. 276, which authorized the Company to subscribe towards the construction of any lateral or connecting road and to acquire an interest therein not exceeding two-fifths of the cost of the road, made the gross receipts subject to the tax, because the exercise of the privilege was a later and distinct privilege or franchise granted to the company. So, the gross receipts of the Metropolitan Road were liable to the tax. While the court recognized the grant under the original charter of authority to the Company to build lateral roads not only which lead to lime-kilns, factories and distilleries, as was urged by the State in argument, but also which was projected for the transportation of freight and passengers, nevertheless the court held the Metropolitan Road or Branch was not built under this provision of the original charter but under the Act of 1865, ch. 70, which authorized the construction of a road between Knoxville and the Monocacy Junction to the boundary of the District of Columbia, where it forms a junction with the Washington Branch.

Under these circumstances, the court declared, this branch could not be considered as a lateral road within the meaning of the charter and the Act of 1865 does not exempt the branch or its franchise from taxation. For the same reason the receipts or dividends derived from the interest in steamship ·or steamboat lines which had been acquired by the Company under the power granted by the Act of 1868, ch. 471, sec. 218, were subject to the gross receipts tax. The ownership in bonds of other railway companies was held not in the exercise of any power granted by the original charter, and these bonds, if acquired under any later grant of the Legislature, made the Company liable to the gross receipts tax on the interest received on such bonds; and, if not so acquired under the Company's franchise, then the bonds were taxable to the Company as would be other bonds. 48 Md. pages 76-80.

While the action which caused this appeal was pending, there were other fiscal controversies and litigation between the State and the Company which grew so acute that the General Assembly of Maryland passed chapter 229 of the Acts of 1876. See *State of Maryland v. Balto. & O. R. Co.*, 34 Md. 344, affirmed 21 Wall. 456, 22 L. Ed. 678; *Balto. & O. R. Co. v. State of Maryland,* 36 Md. 519; *Balto. & O. R. Co. v. State of. Maryland,* 45 Md. 596. According to its title, it was an act to repeal any supposed exemptions of the capital stock of the Baltimore and Ohio Railroad Company, or any of its branch roads, or its or their property, real, personal or mixed, from taxation for state, county or municipal purposes, Section 1 of the statute was an enactment in the terms of its title, and it was followed by the provision of section 2 that should the company assent to these terms by the first of October, 1876, the Company should, from the time of such assent, "thenceforth forever be relieved from the payment into the treasury of this State of one-fifth of the passenger receipts over the Washington Branch of said Company's road." The Company did not accept this offer. Meanwhile the General Assembly of Maryland of

1876, by Resolutions Nos. 13 and 14, had directed that the proper officials proceed at once to assess and collect taxes for state, county and municipal purposes upon all the taxable property of the Company; and from the judgment in *State v. Balto. & O. R. Co.*, 48 Md. 49, which was rendered on February 21st, 1878, the Company had prosecuted a writ of error to the Supreme Court of the United States.

It will not be necessary for the numerous and important controversies between the State and the Company to be recited. It is sufficient to mention that it was the declared intention of the General Assembly of Maryland to adjust and settle by agreement all pending controversies between the Company and the State by subjecting the franchises and property of the Company within this state to taxation for state purposes to a certain extent, and by providing for the establishment by contract of certain rates of toll and transportation for coal, lumber, pig iron, ores of all kinds and stone, transported by the Baltimore and Ohio Railroad Company to the basins of the Chesapeake and Ohio Canal Company at or near Cumberland, and by providing on certain conditions for the release of the right of the State to any proportion of the moneys received by said Company from the transportation of passengers on its railroad between Baltimore and Washington, otherwise than by way of dividends upon its stock in the Washington Branch Railroad of said Company. In this virtual reproduction of the title to the Act of 1878, chapter 155, is expressed the definite intention to adjust and settle by contract all the pending tax and revenue controversies of every nature between the State and the Company. These difficult and recurring problems were attributable to the tax exemption clause of the original charter in respect of its extent, incidence, and limitations, and to the later enabling acts, with no tax exemptions, or, in addition, with newly created revenue charges and financial obligations, under which branch or lateral railways had been built as part of the Company's railway system. An

adjustment and settlement was desirable and was effected upon the terms prescribed by chapter 155 of the Acts of 1878. This Act was considered in the appeal of the *State of Maryland v. Balto. & O. R. Co.,* 1916, 127 Md. 434, 96 A. 636, 640. The action in that case was by the State of Maryland against the Company to recover taxes upon the latter's gross receipts at the rates prescribed by chapter 559 of the Acts of 1890, chapter 120 of the Acts of 1896, and chapter 712 of the Acts of 1906, for the years of the period from 1896 to 1908. These rates were in excess of the gross receipts taxes paid by the Company during that period at the rate fixed by the Act of 1878, chapter 155, and the action was to recover the difference due to the higher rates established by the later acts. In this appeal various questions were considered and determined, which need not be stated. It will do to note the declaration of this Court that "The act contemplated a settlement of counterclaims between the State and the railroad company arising out of a number of different contentions" and that "The Constitutions of 1851 [article 3, section 47] and 1867 [article 3, section 48] cannot be given the construction that the State is without the power to *enter into a contract* irrepealable in its nature. Such a construction would make it absolutely unsafe to contract with the State upon any matter." 127 Md. pages 445-447, 96 A. page 641. The determination of this court is found in these summary and concluding words: "And from the considerations set out in this opinion, it follows that the act of 1878 was not *ultra vires,* but was within the power of the State to adopt; that when adopted, assented to, and acted upon by the railroad company in strict accordance with its terms, it became an irrepealable contract, and was therefore unaffected by the Acts of 1890, ch. 559, Acts of 1896, ch. 120, and Acts of 1906, ch. 712; that the consideration for the contract was a sufficient consideration to support it, and that it contains all the elements requisite to bring it within the protection of the Constitution of the United States, art. 1, sec. 10."

The Act of 1878 embraces the numerous terms of the settlement, which are included in its eight sections. There is no occasion to set forth all the particular stipulations of this statute which, on its acceptance and performance by the Company, became the irrepealable contract of the State and the Company. The covenants of the State of present and permanent significance are found in section 1, which will be quoted in separate clauses and italicised for emphasis, are these: "That all the franchises and property of every description and the gross receipts of Baltimore and Ohio Railroad Company within the State of Maryland shall be subject to taxation for State purposes to the extent of an annual tax of one-half of one per centum on the gross receipts of its railroads and branches within this State, including its Metropolitan Branch Rail Road, and from its entire Washington Branch Rail Road, and from all other sources within this State, *but to no further or greater extent, nor otherwise;* and provided, the said company, in consideration of the release of its obligation to pay to the State the one-fifth of its gross receipts for the transportation of passengers over the Washington Branch of its road, as provided by the eighth section of the Act of eighteen hundred and thirty-two, chapter one hundred and seventy-five, shall agree on its part in the manner and upon the terms hereinafter provided, *to modify* its contract for exemption as contained in the eighteenth section of the Act of eighteen hundred and twenty-six, chapter one hundred and twenty-three, incorporating said company, by submitting all its franchises and property of every description, and all its gross receipts within the State to taxation for State purposes, *to the extent and in the manner above named, and to no further or greater extent, nor otherwise,* and shall also accept the provisions of this act in the manner hereinafter provided, then no other, further or greater tax or burden for *State purposes* shall ever be levied or imposed by the authority of this State, or by any law thereof, upon any of the franchises or property of any description or receipts

whatsoever of said company; provided, that nothing in this act shall be construed as exempting *any* property or franchises of the said railroad company from taxation for county and municipal purposes, which *by existing laws and the decisions of the Court of Appeals of this State is now held liable to taxation;* and the exemption from taxation created and provided for by eighteenth section of the act of eighteen hundred and twenty-six, chapter one hundred and twenty-three, entitled "An act to incorporate the Baltimore and Ohio Railroad Company," be and the same is hereby declared *to be modified to the extent* of substituting the tax imposed (*one-half of one per centum on gross receipts*) upon said company by the second section of this act, in lieu of the tax (*one-fifth of the receipts for the transportation of passengers over the Washington Branch*) imposed by the eighth section of the act of eighteen hundred and thirty-two, chapter one hundred and seventy-five, *but to no further or greater extent, nor otherwise.*"

As the statute remains in full force and effect without any agreed change on the part of the Company, its terms are in effect and controlling. *State v. Balto. & O. R. Co.,* 127 Md. 434, 96 A. 636. In clear and precise words it was agreed, "but to no further or greater extent, nor otherwise," (1) that the power of the State to tax for State purposes was limited and fixed to a prescribed yearly tax of one-half of one per centum of the gross receipts of the Company's railroads and branches within the State, including its Metropolitan Branch, and from its entire Washington Branch Rail Road, and from all other sources within the State; and (2) that the power of the State to tax for county or municipal purposes was limited to any property or franchise of the Company which by existing laws and the decisions of the Court of Appeals of Maryland was then held liable to taxation. The form in which this provision with reference to county or municipal taxes upon the property or franchises of the Company is cast precludes argument over its meaning. The limitation of such county and muni-

cipal taxation is not to such property or franchises as are taxable under existing laws, but to such property or franchises, "which by existing laws *and* decisions of the Court of Appeals of this State is now liable to taxation." Thus the standard is not only that of the words of the statute, but of their judicial construction as evidenced by the decisions of this court. The importance of this reference to the decisions is obvious. After declaring that the shares of the capital stock of the Company should be deemed and considered personal estate, the charter set forth tersely that the stock "shall be exempt from the imposition of any tax or burden by the states assenting to this law." As has heretofore been shown, this tribunal had, before the Act of 1878, construed this provision to exempt the Company's franchise, its property and capital stock and its shares of stock, from State, county and municipal taxation except where the properties were held under subsequent franchises granted by the Legislature either with no exemption from taxation conferred or later than the Constitution of 1851. According to the terms of the Act of 1878, what was before dependent upon statute and adherence to the doctrine of *stare decisis* is now secured by the inviolable contract of the State and the Company as evidenced by the Act of 1878. *State of Maryland v. Balto. & O. R. Co.,* 127 Md. 434, 96 A. 636; *State v. Balto. & O. R. Co.,* 48 Md. 49; *Mayor and City Council of Baltimore v. Balto. & O. R. Co.,* 6 Gill 288; *Balto. & O. R. Co. v. Waters,* 105 Md. 396, 413, 414, 66 A. 685.

The ultimate inquiry, therefore, is what, under the Act of 1878, is the proper classification with respect to taxation for county and municipal purposes of the tangible personal property which has been assessed for taxation by Baltimore City and the counties. As has been stated, this personalty is the rolling stock of an interstate steam railway company which is carried as one of the assets of the company in one capital account on its books. For the record of the receipts and expenditures of the funds of the Company, and of the operation of its business

over all lines and branches of its entire system, the Company keeps but one set of records and one system of books of account. None of the rolling stock, whether or not permanently located within the State of Maryland, is assigned for use entirely, or at all, to any particular line or branch, but all of said rolling stock is used indiscriminately upon the entire system and in such localities as the necessities of the freight and passenger traffic require.

This system within the State of Maryland embraces the Company's main line and its Philadelphia, Washington, Metropolitan and other tributary railroads. Whether built in pursuance of the Company's power to construct lateral lines in any direction as conferred by the original charter, or by later supplementary statutes, the only legal entity to purchase, supply, own, maintain and operate the rolling stock for the carriage of freight and passengers on the main line and its branches in Maryland and beyond, is the company, under the ample franchise of its charter that the company "shall have, enjoy and may exercise all the powers, rights and privileges which other corporate bodies may lawfully do for the purposes mentioned in this Act." Section 2. The authority was likewise granted to make, or cause to be made, lateral roads in every direction whatsoever in connection with its main line. Section 14. Furthermore "full right and privilege was reserved to the citizens of the State or to any incorporation of the State to connect with the company's main line by railroad to any part or parts of the State." Section 23. And the company was authorized to purchase and place on *any* railroad constructed by it under the act necessary and proper equipment for transportation. Section 18. As indicated in *Balto. & O. R. C. v. Waters,* 105 Md. 396, pages 403, 404, 412-414, 66 A. 685, the several branches in Maryland of the Company are lateral roads within the meaning of the Charter, although the Washington and Metropolitan branches were built under special supplementary statutes. *Supra.* See *State v. Balto. & O. R. Co.,* 48 Md.

49, 78, as explained in 105 Md. 412, 413, 66 A. 690, 691; Acts of 1836, ch. 276, 1840, ch. 260, sec. 2. "Washington Branch" described as "lateral railroad" in Acts of Congress, 21st Congress, Second Session, March 2nd, 1831, 4 Stat. 476; 23rd Congress. First Session, Feb. 26th, 1834, 4 Stat. 672.

The main line of the Company and its lateral or branch roads in Maryland form and constitute, therefore, a railway system within the contemplation of the original charter. It is impossible to conceive of a railroad company exercising and performing its functions as a public utility without the ownership and use, throughout its authorized extent, of adequate rolling stock. *Wilmington etc. R. Co. v. Reid,* 13 Wall. 264, 20 L. Ed. 568, 570. As this exercise of its franchise was authorized in perpetuity, the movable rolling stock which was exempt as personal property of the carrier from taxation was not limited to the original rolling stock but necessarily embraced its replacement, addition, change, and increase, from time to time, as the corporate business required. *State v. Balto. & O. R. Co.,* 48 Md. 49, 75; *Morgan v. Louisiana,* 93 U. S. 217, 23 L. Ed. 860, 862; 1 *Elliott on Railroads* (3rd Ed.), sec. 69, p. 140. Furthermore, no distinction is reasonably to be drawn between the rolling stock in use on the main line and that in use on its lateral or branch lines, or between the rolling stock in use on the successively built lateral or branch lines. The rolling stock is not fixed personal property. Nor is it allocated or distributed with reference to any particular line or branch, but all is used in general railway service without regard to any section or division of the railway lines or branches but interchangeably throughout the whole railway system, without distinction, as the movement and carriage of freight and passenger traffic demand. So unity and not divisibility is the characteristic of the ownership and use of the rolling stock. Furthermore, the unity of use is reflected in accountancy on the books of Company, and comports with the principle that the tax is laid and assessed upon the

Company. *Cooley on Taxation*, (4th Ed.), sec. 24; *United States Electric Power & Light Co. v. State*, 79 Md. 63, 71, 28 A. 768; *Wilkens Co. v. Baltimore*, 103 Md. 293, 312, 63 A. 562. It is not to be assumed, therefore, that the Act of 1878, which was to effect unity, uniformity and certainty, was enacted with the intention of creating a division of the rolling stock for the purpose of having a portion of the rolling stock allocated to one fraction of the system in Maryland as being thereby exempt under the charter from taxation for county and municipal purposes; and the remaining portion of the rolling stock allocated to the use of the remaining fraction of the system in Maryland, so as to be assessed and taxed for county and municipal requirements. This court denied by its decision in *State v. Balto. & O. R. Co.*, 127 Md. 434, pages 447-449, 96 A. 636, an analogous assumption there made by the State that the Act of 1878 might be divisible in its operation as to the gross receipts tax as between the main line and the lateral or branch roads.

Moreover, in *Mayor & City Council of Baltimore v. Balto. & O. R. Co.*, 6 Gill 288, the question was raised and decided that the rolling stock of the Company separately allocated to the main line of the Baltimore and Ohio Railroad Company and the rolling stock of the Company separately allocated to the Washington Branch of that Company, were both equally exempt under the Charter and the Company could not be assessed and taxed for such personal property. It is true that the Metropolitan Branch of the Company had not been built at that time, but the Washington Branch had been built under the franchises granted to the Baltimore and Ohio Railroad Company by the special act of 1830, ch. 158, of 1831, ch. 332, and of 1832, ch. 17. Furthermore, section 5 of chapter 158 of the Acts of 1830 provided that nothing therein contained shall be so construed as to preclude the legislature of this State from the imposition of such taxes as may be reasonable and just in accordance with the burdens imposed on other real or personal property, but the act also provided that the Company

should have all the powers, rights and privileges which the Company was empowered and authorized to have and exercise in the use of its railroad from the City of Baltimore to the Ohio River, and be subject to the same conditions and restrictions, except where otherwise provided by the Act of 1830. It should be noted further that under the Act of 1841 of the March Session, chapter 23, movable personal property, if assessable, could be assessed against a corporation only in the place where it maintained its principal office for the transaction of its business, which has always been in the City of Baltimore. Hence, the decision in *Mayor & City Council of Baltimore v. Bolto. & Ohio R. Co.*, 6 Gill 288, for the Company cannot be indecisive because, with a separate assessment against the Company for its rolling stock on the main line and another such assessment on the Washington Branch or lateral road, a verdict might be rendered for the municipality on either or both assessments, but a verdict for the Company must necessarily be that no taxes were due and payable to the municipality of Baltimore either upon the separately assessed rolling stock of the main line or upon the separately assessed rolling stock of the Washington Branch because of an effective statutory exemption of both.

Thus, in the language of Mr. Chief Justice Waite, who spoke for the Supreme Court in *Douglass v. Pike County*, 101 U. S. 677, 687, 25 L. Ed. 968: "After a statute has been settled by judicial construction, the construction becomes, so far as contract rights acquired under it are concerned, as much a part of the statute as the text itself, and a change of decision is to all intents and purposes the same in its effect on contracts as an amendment of the law by means of a legislative enactment." See *Gelpcke v. Dubuque,* 1 Wall. 175, 68 U. S. 175, 17 L. Ed. 520; *Havemeyer v. Iowa County,* 3 Wall. 294, 70 U. S. 294, 18 L. Ed. 38; *Taylor v. Ypsilanti,* 105 U. S. 60, 26 L. Ed. 1008; *Louisiana, ex rel. Southern Bank v. Pilsbury,* 105 U. S. 278, 26 L. Ed. 1090; *Los Angeles v. Los Angeles Water Co.,* 177 U. S. 558, 575, 20 S. Ct. 736, 44 L. Ed. 886.

The judgment in *Mayor & City Council of Baltimore v. Balto. & O. R. Co.*, 6 Gill 288, was that the rolling stock of the Company for the carriage and transportation of freight and passengers, whether in use upon the main stem or line of the Company or upon its lateral roads or branches, was exempt from taxation by virtue of the provisions of the original charter of the Company. The decision was made before the Metropolitan Branch and the Philadelphia Branch were in existence. The later decision (1878) in *State v. Balto. & O. R. Co.*, 48 Md. 49, is not in conflict with the earlier case, and, therefore, its effect, by virtue of the provisions of the Act of 1878, is to prevent the rolling stock of the Company from being liable to taxation, for municipal and county purposes, as the rolling stock was not within the description of property which by existing laws and the decisions of the Court of Appeals of Maryland was held liable to such taxation when the Act of 1878 became effective. 1 *Cooley's Constitutional Limitations*, (8th Ed.), pp. 554-572. Its ownership is indispensable to the enjoyment of the franchise granted by the Act of 1826 and the fulfillment of its corporate duty to the public.

It should be remarked, in conclusion, that the rolling stock, which is the subject matter of the present controversy, is indispensable to the enjoyment of the franchise granted by the Charter of 1826, and, so, to the fulfilment of its creator's vast design of its contemplated public service. Without adequate, suitable and efficient rolling stock, carriage of freight and passengers on its lines could not proceed. Thus to this rolling stock is ascribable the distinction that it is property whose acquisition and right of operation wherever traveling are not dependent upon a later and distinct grant of privilege or franchise, and whose ownership and use are within the powers conferred by the terms of the original charter of 1826. In these qualities may be found the reason that throughout the long corporate existence of the Company the record affords no instance of an assessment of the rolling stock upon which the Company has paid any State, county or municipal tax.

Since the fundamental question is the *right* to make the assessment and lay the tax, and not the *method* by which the assessment may be made, the Court has not considered the procedure adopted in making the assessment in the instant case. For the reasons assigned, the order of the chancellor will be affirmed.

*Order affirmed, and cause remanded.*